versus Enrique Saldana and George N. Greene, Jr. Mr. Villegas. Good morning again. My name is Gabriel Villegas with the Federal Defender's Office in St. Thomas. I'm appearing on behalf of the appellant, Mr. George Greene. And I'd like to reserve two minutes if I can. That request to reserve two minutes for rebuttal will be granted. Thank you, Your Honor. May it please the Court, in this appeal I have raised three issues on behalf of Mr. Greene. And unless the Court has specific questions on the first two issues, I'd like to spend the remaining five minutes on the third issue, which is of significant importance and interest to me. That particular issue addressed George Greene's decision to testify in his own defense. In this case, Mr. Greene was a police officer alleged of some very serious corrupt crimes. The defense was always, yes, I may have been involved in these activities, but essentially I was working and just appearing as a dirty cop. Mr. Greene's credibility was an important issue in the case because it was critical to his defense. That defense, in very short order, was essentially gutted by the government when on cross-examination a counsel asked Mr. Greene about his prior felony conviction. That prior felony conviction arose from the severed trial and two specific gun counts. Of course, at that point, Attorney McKelvin, who tried this case, stood up and objected, and there was a sidebar. Prior to that, I know Attorney McKelvin had asked the Court whether or not what I think counsel believed was a 609 conviction was going to be admissible, and apparently Judge Gomez believed that he didn't need to cross that bridge until it was time for Mr. Greene to testify. But regardless, at sidebar, the Court queried about what felony conviction the government was talking about and how that information would come in. There was no specific rule that was cited by the government as to why Mr. Greene should have to admit this prior felony conviction in a severed case. The Court's position was, well, I don't think that there has been an actual judgment conviction entered as of today's date. And government's counsel apparently was unsure whether or not that would constitute a, quote, conviction for the purposes of asking Mr. Greene about it. Regardless, that bail had been— It had conviction. In fact, the trial had just taken place like a week before. Yes, sir, five days. There had not been any sentence. There had not been a sentence. There had not been any post-trial motions that were filed or ruled upon. But most importantly, according to Judge Gomez, there hadn't been a judgment of conviction entered. And that seemed to be what the key was for Judge Gomez at the time. So in my brief, I addressed this third issue as a 404B because it was clear to the Court that it wasn't a Rule 609 conviction. But let's say for a minute it was a 609 conviction. At some point, the government would need to say why the probative value of that 609 conviction outweighed its prejudicial effect. There was no answer. That's when I reviewed the transcript. I thought, well, this must be a 404B. If the government didn't have an explanation as to that weight test and Judge Gomez believed that it wasn't a 609 conviction, that can only be 404B. And so I conducted in my brief a 404B analysis because I firmly believed that it could only have been referenced for a prior bad act. Again, without any direction from the government as to what he intended to do when he elicited that, other than what his statement was just to verify that the conviction occurred. It was highly prejudicial because if we look at a 404B analysis, there wasn't an explanation as to whether or not it would have proved motive, intent, any of the other exceptions. Let me ask you this question, Mr. Villegas. What's our standard of review of this question? Well, it's plain error. And I am asking the Court to exercise that plain error standard because this is clear and this is obvious. And it's clear and obvious that not only government counsel could not have elicited that conviction without establishing a proper basis for it, but essentially it's punished George Green for severing his trial. That's why this affects substantial rights because I'm confident that in preparation of Mr. Green's defense, there was at least some discussion of what happened five days ago. There was no answer from either the Court or any kind of notice from the government that it intended to introduce any kind of prior conviction. And everybody was calling it a prior conviction, but really it was a jury verdict that it just happened five days prior. Why wasn't the Court's curative instructions? Well, the Court actually was quite generous with the defense counsel, and I will certainly concede that, because immediately after the statement was made, after a defense counsel objected, the Court not only instructed the jury to disregard Mr. Green's statement, but also later on carefully prepared an instruction that said, hey, look, not to consider any kind of conviction, just like you shouldn't consider any kind of sentence. But it wasn't enough. It isn't enough, and once the jury hears that, they're not looking or thinking about anything else. In their mind, George Green was guilty, just like he was guilty in the gun case. And that's why I believe under a 404B analysis it was appropriate. It's important for this Court to step in under this plain error standard, which really I was unable to find a case directly on point. So I believe this is that case, that it is plain error when a defendant in a severed case, and there is a decision by a jury, a verdict of guilty entered, that that defendant not be subject to that guilty verdict on cross-examination unless the government properly remedies that with either a justification under 404B or Rule 609. Thank you. Okay, we'll have you back on the call. Thank you. Ms. McClain? We'll hear from Ms. McClain then. Good morning, Your Honors. My name is Dolaise McLean, and I'm appearing on behalf of the appellant, Enrique Saldana. May it please the Court, Your Honors. As a threshold matter, we should not even— I'm sorry? Oh, I'm sorry. Thank you. I'm going to reserve two minutes rebuttal. That request will be granted. Thank you. As a threshold matter, we should not even be here, because as you know, jurisdiction is of paramount importance to a court. It is the power of the court to hear a case. In this case, the district court had no jurisdiction, simply because of the contrived means by which federal law enforcement officials engaged in activity designed to create a federal crime. The sole basis of jurisdiction is the supposed Hobbs Act violation, which clearly did not happen in this case. In addition to the government's failure to produce evidence of this Hobbs Act violation, we also have serious—and I mean, which constitutional violation isn't— but we have serious constitutional violations that warrant the vacature of Mr. Saldana's conviction. To begin with, the Hobbs Act violation. As a general matter, Mr. Saldana was charged with conspiracy to commit extortion and extortion. Simply put, there was no conspiracy here, because conspiracy requires an agreement to commit an unlawful act. Mr. Saldana has consistently maintained what we know to be the truth, i.e., he was engaged in a legitimate undercover operation to ferret out illegal activity on St. Thomas. Therefore, no conspiracy. Even if we were to think of the Hobbs Act, as this court has said in Gennady, as encompassing attempt or inchoate offenses such as conspiracy, we do not—we still do not—the government still failed to produce evidence to substantiate that count. Furthermore, the government failed to prove—to offer evidence to prove the substantive count of the Hobbs Act violation. What was the deficiency? Namely, you need actual or—actual in the case of the substantive Hobbs Act— or potential acts in the case of the conspiracy to—conspiracy to commit a Hobbs Act violation that impacts the commerce, interstate commerce. So you either need actual or potential acts which impact interstate commerce and can therefore support the attempt or the substantive act. We have neither here. Well, we've said, though, in other cases that the depletion of assets is sufficient. The depletion of assets is sufficient. The problem we're having here, again, is the facts, right? That there were no assets to be depleted in the first instance because by December 22nd, which was a full, what, 19, 18, 17 days after the flower had been destroyed, everyone was on notice that that had been the case. There were no assets to be depleted. Well, isn't the underlying drug scam enough? The underlying drug scam is not enough. And, in fact, the underlying drug scam itself, because the flower was destroyed, there was nothing. The government didn't charge anybody with the underlying drug scam. They charged Mr. Saldana with committing a Hobbs Act violation, i.e. depleting assets that are engaged in interstate commerce by- Well, if the scam had been successful, they would have depleted Motto's assets by either $5,000 or $10,000, would they not have? They still would not have depleted assets that were in interstate commerce because it wasn't actual cocaine. It was flower cooked to look like cocaine. But aren't there cases that stand for just that scenario that the assets spent to buy fake drugs are assets taken out of interstate commerce? There are assets. Indeed, there are cases. But this Court also has cases that say, look, the Hobbs Act cannot be that broad because, by definition, just about everything in our globalized world has an effect on interstate commerce. So at what point do we draw the line? Especially when the government knew, had at least a two-week notice, that whatever product, i.e. the flower or supposed fake cocaine, was no longer in existence. That there was no threat. Where do we draw the line? What is the rule you want us to adopt? That in cases such as this where we have no actual receipt of extortionate funds and where there was no predisposition for Mr. Saldana to engage in these kinds of acts and where the government was on notice that the allegedly, that the flower, the alleged cocaine, had already been destroyed, that at that point they cannot say, oh, but something happened in the far past that now gives rise to an effect on interstate commerce. Well, that doesn't work, does it? Because your opening salvo was where no money was exchanged. In most operations where the police have an understanding of what's going on, there is no actual exchange. The exchange is talked about, it's arranged, but it's not necessarily consummated. It's not consummated, and therein lies the problem. We need more than just suppositions. We need more than just remote possibilities of things happening in this case. Weren't the witnesses fairly straightforward? I mean, the jury obviously believed here, but, I mean, it was put before them. Believe it or don't believe it. But it's not a question for the jury. It's a question of law. It's a question of, to begin with, did the feds have any actions that implicated a federal concern such that they should be involved in this case to begin with? And there was no such concern. And to reach for acts that they know, acts that are in the far past, to try and manufacture that jurisdiction becomes a legal question that this court needs to address. Mr. Page. Good morning. My name is Nolan Page, and I represent the United States in this matter. If I may address counsel's arguments in reverse order. You may. With respect to the effect on interstate commerce, counsel at some point conceded that almost everything affects interstate commerce. In this particular case, that was in fact the case. The flour that was used to make the sham drugs, the depletion of the assets from the FBI sting operation, and it is a question for the jury in the first instance, but at this point it's a question for this court. And there's substantial case law that supports the depletion of assets theory as well as the effect on interstate commerce with respect to the fake drugs as well. Those were drugs that were taken that drug dealers could have otherwise bought in other places. Now, which assets, if you're arguing the depletion of assets theory, which assets and whose assets were capable of depletion by virtue of this scam we'll call it? The FBI's buy money, the $5,000. That is $5,000 that the FBI otherwise could use for other things. And there's case law that supports that the depletion of assets with respect to government buy money does satisfy interstate commerce. Which case is that? Gennetti. Okay. So I feel that for those reasons that there is substantial interstate commerce that was proven in this particular case. Now, with respect to Mr. Green, under 609 a felony conviction is permissible to attack defendant's credibility. Mr. Villegas even concedes that credibility was a central theme of this particular case. And it's the government's position that the curative instruction as well as the fact that the judge struck the testimony was enough to avert any prejudice in this case. Do you acknowledge it was error to have asked that question? I do not acknowledge that it was error to have asked it. Because I do believe that case law supports the fact that a felony conviction is admissible when attacking credibility. It seems to me that there's substantial law that a conviction is not final until there's a judgment. The judgment typically is not entered until there's a sentence. Given that being the case, the fact that the testimony was stricken immediately cured it, cured any prejudice or any error. I mean, is that enough in front of a jury who has a trial of a police officer who's charged with serious offenses? Is that enough to strike reference to the fact that they've already heard that this person was convicted of other crimes? In this case, I do believe it was. Given the fact that the judge came, not only did he give a curative instruction, but he struck the testimony as well. And I would also add that Mr. Green did not testify as to the nature of the conviction, only the fact that there was a conviction and there was not an objection by counsel. But the question was a felony, right? That's correct. Okay, so for all the jury knew, it could have been a very serious felony. That's correct. However, I still submit to the court that it was enough for the judge to strike that testimony immediately, as was asked by counsel at that moment. And out of an abundance of caution, not too long thereafter, he came back and gave a curative instruction, as counsel requested. And at that stage, defense counsel felt that that was enough, and we moved on. So for those reasons, I submit to the court that in Mr. Saldana's case, there was sufficient evidence of record to show that there was an effect on interstate commerce. And with respect to Mr. Green, I submit to the court that any error, if there was any error, was cured with the curative instruction and the fact that the testimony was stricken. Thank you. Ms. McClain didn't touch on it in her argument, but I think she did sufficiently in her brief on Mr. Saldana. The question of whether or not the motion for judgment of acquittal should have been granted goes to the sufficiency of the evidence. And what was there that showed Saldana knew about this scam, this attempt to scam Mr. Motto of the money? Well, actually, that came at the outset of the trial when Mr. Motta testified that Mr. Rodana first approached him with this particular scheme, that if he paid $10,000, essentially delivering a message from the VIPD offices, that these drugs would not be sent to Hyden. Mr. Motta testified that it was Rodana who came to him at the behest of the police officers. Yeah, but where was Mr. Saldana's – how does Saldana get connected to that? Mr. Green testified that he advised Saldana of the actual exchange after the extortion payoff. He testified immediately he advised Mr. Saldana of the fact that he did have the money. And there was also testimony from Mr. Saldana at trial that he was actually present at the hometown gas station when they initially met, before they went to Frenchtown. Mr. Saldana placed himself there on the scene. Okay. As well, I would just add that there were sufficient telephone contacts as well throughout this scheme. Okay. Thank you. Did you have anything else, Mr. Page? Nothing further. All right. Thank you. Thank you very much. Mr. Villegas? I would like to touch on really how the exchange occurred to give you a better feel for what happened. This is in my appendix. A question by a counsel. And by the way, do you have any felling convictions? Mr. Green says, yes, I do. The next question from a government counsel is, what are they? And then there's an objection. So it's pretty obvious that the government had every intention not only to just get the felony conviction, but to really make sure that Mr. Green could absolutely not get a fair trial by going over the details of what these felony convictions were five days earlier. Well, everyone would agree that you couldn't go into the details in that situation. Right? And obviously it stopped there. It would be obviously a violation of the rule specifically. It was stopped. The curative instruction was given. I don't know if there was testimony before it was given, but fairly quickly afterwards. So I'm not getting your point. Well, my point is, is that if the government in its representations is trying to claim we just wanted to mention, make reference to the felony conviction that recently occurred, actually the government was prepared to take it a step further. That's why I'm asking this panel to exercise its plenary discretion because this is how open and obvious it is, at least within our district where if we have a defendant who is seeking to sever his trial without some intervention by this court, it's pretty clear that the government is going to continue or at least attempt to use that severed case, whichever one there's a conviction first, in the other case. And it's important to note Mr. Green was acquitted of several of these charges, several of these counts. The jury found him guilty of five, but that's significant because what it does is it sends a message that there's a distinct possibility that the jury would have acquitted him of all charges if that felony conviction hadn't been referenced. You could just as much argue the other way, that the felony didn't influence the jury that much because they acquitted him on certain counts. I understand that position too, Jake. Thank you. Ms. McClain. Emphasis on the miss, thank you. At what point, your honors, you asked, at what point do we draw the line? And you know, this court has evinced just a real frustration with this Hobbs Act violation. The reality of the situation is, you know, there's a local court, Mr. Saldana could have been tried there. There's no need for the district court to hang on to jurisdiction to somehow try someone. When there's an equally good system in which he could have been tried, in which jurisdiction would have been proper. And so, yes, this court has expressed frustration up to as recently, both in U.S. v. Rutherford, which is a non-published case, but even in U.S. v. Walker, which is a published case, that look, at some point the Hobbs Act, you know, claims they have to stop somewhere. We don't go around manufacturing jurisdiction because we want to. In U.S. v. Walker, though, the interstate commerce requirement, though tenuous, was sustained. And this is the problem because, look, and we conceded this much in our brief. We understand it can be potential, de minimis, tenuous, but in this case, we submit it wasn't even there. And that was the whole problem because the other question the court asked, it says, well, how does Saldana even get involved? Well, he was involved because he was exercising his legitimate local police power to investigate a murder-for-hire. And we can't forget those key facts. At the end of the day, this had nothing to do with the flower, and that's why it was destroyed, and that's why there were no assets to be depleted. This was simply about getting at several persons who we knew were involved in a murder-for-hire scheme. And so we cannot forget that. My other two issues, of course, we have the denial of the right to a public trial, and that, we submit, is serious. There is no such thing as a de minimis closure of a court. Either you have a constitutional right to a public trial or you don't. And my third point for the purpose of this panel relates to the Brady violation in that the government created some of the circumstances that led to them being in violation of Brady. I think that's the question. Thank you. Okay. Thank you, Your Honor. Okay. We thank counsel for a case that's very well argued, and we'll take the matters under advisement.